**U.S. DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI-DADE DIVISION**

------------------------------------------------------------

| | |
|---|---|
| **BPA INTERNATIONAL, INC.,** : | |
| : | **Civil Action No.** |
| **Plaintiff,** : | |
| : | |
| – Against – : | |
| : | **COMPLAINT** |
| **PAPA, INC.,** : | |
| : | |
| **Defendant.** : | |

------------------------------------------------------------

BPA International, Inc. ("BPA" or "plaintiff"), by its undersigned attorneys, as and for its complaint against the defendant, PAPA, Inc. ("PAPA" or "defendant"), alleges the following:

## THE PARTIES

1. Plaintiff is a New York State corporation with its principal place of business located at 273 Walt Whitman Road, Suite 194, Huntington Station, New York 11746, in the County of Suffolk. Plaintiff is authorized to do business in Florida, but is not incorporated there.

2. Defendant is a Florida corporation with its principal place of business located at 390 NE 191st Street Suite 8655, Miami, FL 33179, in the County of Dade.

3. BPA has brought this action against PAPA to recover fees due to it for the phone call evaluation services that it performed at PAPA's request pursuant to written agreements between the parties. BPA performed its services for approximately nine months, and PAPA paid several of BPA's invoices without objection or protest. However, after a payment received by BPA on or about February 29, 2024, PAPA failed to pay any BPA invoices, even

though they pertained to services dating back as far as August, 2023 (PAPA had paid some invoices for services performed at later times).  Up to the point when BPA began more assertively pressing PAPA for payment of its invoices, PAPA never raised any complaints about the quality of the services, nor did it challenge the invoices it had received for services rendered many months earlier.  In May of 2024, PAPA, for the first time, made spurious and vague allegations of quality issues with BPA's services.  However, PAPA then denied BPA continued access to its system so that BPA could investigate PAPA's claims, which BPA had offered to do in good faith to resolve the claimed quality issues.  This manifested that PAPA's non-payment had nothing to do with quality issues.  Ultimately, PAPA ceased communications with BPA, and failed to respond to BPA's efforts to resolve this matter short of the present litigation.  Accordingly, BPA seeks recovery of the amount of its unpaid invoices in the sum of $115,722.59 as of August 16, 2024, including accrued interest, with interest continuing to accrue upon the unpaid balance at the highest rate permitted by law.

## JURISDICTION AND VENUE

4. PAPA is subject to personal jurisdiction in this Court as it is a Florida corporation with its principal place of business within this judicial district.  Moreover, as discussed below, PAPA is also subject to personal jurisdiction in this Court pursuant to F.S.A. § 48.193 (1)(a)(1) and (2) as it operated conducted, engaged in, and/or carried on a business or business venture in the State of Florida and engaged in substantial and not isolated activity within the state, which activity gave rise to the claims at issue herein

5. The Court has diversity jurisdiction over this case pursuant to 28 U.S.C. §1332 (a)(1), as the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.

6. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2), because it is the judicial district in which PAPA is located and where a substantial part of the events or omissions giving rise to the claim occurred.

## STATEMENT OF RELEVANT FACTS

7. BPA and PAPA negotiated and subsequently entered into a Master Services Agreement ("MSA") and Statement of Work ("SOW") (collectively, the "Agreement") in or around July 15, 2023, copies of which are attached hereto as Exhibits "1" and "2," respectively.

8. Pursuant to the Agreement, BPA was to provide PAPA with call evaluation services, *i.e.*, reviewing calls between PAPA and its customers, and evaluating the performance of PAPA representatives in their interactions with PAPA customers. These evaluations were created by BPA employees who used BPA's proprietary evaluation software and business models that were applied to previously-agreed criteria developed by BPA and PAPA.

9. BPA provided those evaluation services as agreed.

10. From the time when BPA's performance under the Agreement commenced, PAPA made no complaints or objections with respect to BPA's invoices or the quality of its services up until long after its pattern of non-payment began, as discussed below.

11. PAPA ultimately failed to pay $86,105.08 in outstanding invoices due for BPA's services performed during the period from August through October, 2023 and February through April, 2024. *See* BPA invoices dated October 18, 2023 ($45,340.00), March 13, 2024 ($13,894.44), April 5, 2024 ($13,319.60), and May 6, 2024 ($13,551.04) attached as Exhibit "3" hereto. With interest and a thirty-day cancellation fee arising out of PAPA's failure to provide 30

days' notice of termination for convenience as provided for in the MSA § 3.3, the total amount due is $115,722.59 as of August 16, 2024, with interest continuing to accrue thereupon.[1]  *See* BPA's August 16, 2024 Cancellation Fee invoice ($13,696.56) attached as Exhibit "4," Late Payment Invoice dated August 16, 2024 ($15,920.95) attached as Exhibit "5, and Account Aging Spreadsheet attached as Exhibit "6" hereto.

12. Up until May of 2024, PAPA accepted BPA's invoices without objection, paid a few of them, and never communicated any disputes regarding any invoices.

13. In May, 2024, PAPA unexpectedly advised BPA, for the first time, that it would be immediately terminating BPA's services due to PAPA's claimed dissatisfaction.

14. There was no prior formal or informal, written or verbal record of any communication from PAPA to BPA regarding significant, quantifiable or uncurable dissatisfaction with BPA's services, or PAPA's intention to terminate the project, despite the nine months that had elapsed since BPA began providing services to PAPA.

15. BPA was completely surprised by this statement for multiple reasons, including the fact that, as discussed at length below, the MSA clearly outlines the agreed Procedure for Termination by Cause.

16. The agreed Procedure for Termination by Cause provides that a party can notify the other party of a material breach and provide a 30 day period to cure the breach prior to providing final notice of termination if the breach was not cured.  *See* MSA Section 3.1.  In any event, this process would have required 30 days' notice and payment for all services rendered up to the time of termination).

---

[1] The MSA provides for a 3% per month penalty for invoices not paid within the 30 day period.  To the extent that: (i) these penalties are determined to amount to interest; and (ii) such interest rate is exceeds any legally permissible rate, BPA's claim will be reduced, if necessary, to the maximum recoverable amount.

4

17. The agreed Procedure for Termination by Cause was not followed by PAPA in any respect.

18. PAPA also didn't seek to terminate for convenience or without cause as was permitted under 3.2/3.3 of the MSA (requiring either 60 days' or 30 days' notice).

19. PAPA's failure to follow the agreed procedure for termination for cause and termination without cause/for convenience is inconsistent with its claimed dissatisfaction with BPA's services.

20. At the same time, PAPA immediately discontinued BPA's access to its calls needed for BPA to complete work under any cancellation period.

21. PAPA's immediate disconnection of access, without notice to BPA, violated the MSA. It was also extreme, unusual and in no way proportionate to the alleged dissatisfaction. It served no objective business purpose.

22. In an effort to address PAPA's alleged dissatisfaction that was raised with BPA in a verbal conversation, and based solely on vaguely-described complaints allegedly made by another member of the PAPA team who did not communicate them directly to BPA, BPA agreed to investigate in good faith.

23. BPA advised the PAPA team that BPA needed access to PAPA's system to conduct the investigation. BPA, after following up with PAPA on numerous occasions spanning weeks and ultimately months, was finally granted the necessary access.

24. That access was again later terminated, without notice and for no reason known to BPA, prior to BPA's completion of its investigation.

25. Thus, PAPA refused to provide BPA with the opportunity to investigate, identify and potentially provide a cure for the alleged dissatisfaction.

26. BPA communicated with PAPA several times, particularly during the period from May, 2024 through August, 2024 in an unsuccessful effort to have its invoices paid.

27. For the initial Soft Launch period dating back to late summer and fall of 2023, the parties expressly agreed that PAPA was responsible for the full invoice amount. *See* SOW at 3-4. However, the full balance of $45,340.00 remains unpaid. *See* BPA's October 18, 2023 invoice attached as the first page in Exhibit "3." As noted in the SOW at 4, BPA had already waived the soft management launch fee of $7,411.32.

28. Notably, the SOW specifically provides for weekly virtual meetings and calibration sessions, monthly business reviews, and quarterly business reviews, all with a stated focus on QA issues. These meetings and reviews were conducted, but PAPA never stated dissatisfaction, any intention to terminate the project, a need for a cure period or a performance improvement plan in any of these meetings. On the contrary, the relationship between BPA and PAPA was amicable and cooperative.

29. Pursuant to Section 12.2 of the MSA, payment of BPA's invoices by PAPA is due within 30 days of its receipt of BPA's invoices, *see* also SOW p. 9, except for amounts that PAPA reasonably and in good faith disputes.

30. BPA timely sent its invoices in Exhibit "3" to PAPA, which didn't dispute any of them.

31. Instead, PAPA simply didn't pay them.

32. PAPA has yet to provide anything reflecting a specific, reasonable and good faith dispute can be transparently investigated. For example, vague assertions about brief, limited, inabilities to score sufficient calls arising from temporary absences of PAPA workers

6

(due to vacations, sick time, etc.) lack merit, as this is a standard reality in the industry, one promptly addressed when staff returned, and one not caused by BPA.

33. BPA did its utmost to gain clarity and address any level of alleged dissatisfaction that was first brought to its attention during the phone call with PAPA in May 2024.

34. As manifested in numerous emails, and phone calls, BPA was sincerely interested in making sure PAPA was a completely satisfied customer. It was willing to take ownership of and correct any problems or concerns regardless of their size.

35. BPA took PAPA's claims extremely seriously, and attempted in good faith over the course of several months to investigate.

36. BPA also encouraged PAPA to uphold the agreed Procedure for Termination for Cause, unfortunately to no avail.

37. PAPA failed to follow agreed procedures for raising dissatisfaction.

38. PAPA failed to provide uninterrupted system access to BPA so that BPA's work could continue during any cure period or other notice period

39. PAPA failed to provide the necessary access to BPA to allow its investigation of PAPA's allegations of dissatisfaction to be completed.

40. After its raising its claims of dissatisfaction with BPA's services in May of 2024, PAPA thereafter repeatedly failed to respond to BPA's email and telephonic attempts to obtain payment of its legitimate invoices for work that BPA completed over a period of approximately nine months, the earliest of which invoices dates back to the commencement of the project. BPA's attorney sent an August 22, 2024 demand letter with copies of relevant exhibits to PAPA via first class mail and e-mail, a copy of which is attached hereto as Exhibit

"7." PAPA did not respond to it. BPA's attorney sent a January 3, 2025 follow-up e-mail to PAPA (which also includes the e-mail that accompanied the August 22, 2024 letter and exhibits as well as additional copies of those documents), a copy of which is attached hereto as Exhibit "8." PAPA again failed to respond.

## COUNT I.

### (Breach of Contract or Breach of Implied Warranty of Good Faith and Fair Dealing)

41. Plaintiff repeats and realleges the allegations set forth in numbered paragraphs 1-40 as if set forth at length herein.

42. The Agreement was the product of negotiations and an exchange of promises between the parties, *i.e.,* BPA agreed to perform its evaluation services and PAPA agreed to pay BPA its agreed-upon fees, with which BPA's subsequent invoices were consistent.

43. The Agreement, both in the parties' promises and obligations stated therein and in the actual performance of the Agreement, involved the exchange of bargained-for consideration.

44. The Agreement specified the essential terms of the parties' promises and obligations so that they were readily understandable to a reasonable person.

45. The Agreements amounted to a valid, legally binding and enforceable contract.

46. BPA fully performed its obligations to PAPA under the terms of the Agreement.

47. As discussed in detail above, PAPA failed to: (a) pay BPA the agreed-upon sums due to it; (b) follow the agreed processes and notice periods for cancellation; and (c)

permit BPA to investigate the claimed insufficiency of performance; each and all together, these amounted to a material breach of the parties' agreement.

48. Florida law recognizes that, implicit in the parties' Agreement was an implied covenant of good faith and fair dealing, requiring that parties follow standards of good faith and fair dealing designed to protect their reasonable contractual expectations.

49. Nothing in the parties' express contractual agreements limited the applicability of the implied covenant of good faith and fair dealing.

50. PAPA's defendant's failure to pay the amounts due in a timely fashion, its failure to follow the Agreement's cancellation procedures, and its refusal to permit BPA to investigate the alleged problems with its performance amounted to breaches of the parties' Agreement.

51. PAPA's failure to pay the amounts due in a timely fashion, its failure to follow the Agreement's cancellation procedures, and its refusal to permit BPA to investigate the alleged problems with its performance were not in accordance with BPA's reasonable contractual expectations and the implied covenant of good faith and fair dealing, and amounted to a breach of the implied covenant.

52. BPA suffered damages as a direct result of PAPA's breach of the parties' Agreement and its breach of the implied covenant of good faith and fair dealing, in the form of lost revenue for the value of its services totaling $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue.

53. By breaching the parties' Agreement and implied warranty of good faith and fair dealing that existed between the parties, PAPA is liable for the damages suffered by BPA as a result thereof, as described above.

54. Pursuant to the foregoing, PAPA is liable to BPA in the amount of $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue, under BPA's claim of breach of contract/breach of implied covenant of good faith and fair dealing.

## COUNT II.
### (Alternative Claim for Account Stated)

55. BPA repeats and realleges the allegations set forth in numbered paragraphs 1-40 as if set forth at length herein.

56. At the time PAPA stopped paying BPA's invoices, the parties had prior transactions involving BPA's performance of services and rendering of invoices, and PAPA's paying such invoices to BPA.

57. Based upon the provisions in the Agreement and the parties' course of dealing up to the time when PAPA stopped paying BPA's invoices, the parties had agreed upon the services to be performed by BPA and the fact of payment, and amount of payment, that PAPA would make to BPA with respect to them.

58. BPA sent invoices and other communications to PAPA as alleged above and reflected in Exhibits 3 to 6 hereto regarding the services it performed for PAPA.

59. From the time the services were performed by BPA beginning in the fall of 2023, through the time that its invoices and statements were later sent, and up until May, 2024, PAPA never disputed the amount of any invoices, or objected to paying them, or alleged any setoffs, nor did it challenge the quality of the services rendered.

60. Only after BPA continued to press PAPA for payment of outstanding invoices did PAPA raise any such alleged issues.

61. By accepting BPA's services, invoices and statements over the course of a minimum of several months, without any complaint or objection, and by its partial payment of amounts due, and without making any objections, reservation of rights, or claims of offsets with respect thereto as such invoices were received, PAPA accepted the terms of its agreement with BPA, and the amounts charged by BPA for the services performed.

62. PAPA's acceptance of BPA's invoices, its partial payment, and its failure to make complaints or objections or claims of offsets over a period of many months amounts to an agreement to an account stated by PAPA, and to the correctness of the invoiced amounts.

63. Pursuant to the foregoing, PAPA is liable to BPA in the amount of $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue, under BPA's claim of account stated.

## COUNT III.
### (Alternative Quasi Contract/Quantum Meruit)

64. BPA repeats and realleges the allegations set forth in numbered paragraphs 1-40 as if set forth at length herein.

65. Assuming, *arguendo,* solely for purposes of this claim, pled in the alternative, that the parties did not have a contract, as alleged above, BPA seeks recovery for the value of its services under the alternative claims of quasi contract and quantum meruit.

66. BPA capably, comprehensively, satisfactorily and in good faith performed the services documented by the invoices identified above, which conferred a benefit upon PAPA.

67. By accepting the BPA's invoices without any complaint or objection for many months thereafter, and making numerous payments as set forth above without any objections, reservation of rights, or claims of offsets, PAPA was aware of the services BPA performed.

68. PAPA accepted the services rendered by BPA on its behalf and the amounts that BPA charged for such services, and it retained the benefits of those services.

69. As a result of the services BPA performed, and the prior course of dealings between the parties, pursuant to which BPA was compensated for the services it performed in accordance with its invoices, BPA had a reasonable expectation that it would be compensated in full for the services performed in the amounts sought in its invoices identified above.

70. BPA's invoices reflect the reasonable value of its services. They were customary in the industry for the services performed by a company of BPA's caliber. This is also demonstrated by the fact that PAPA paid some of BPA's invoices in full without any objections, reservations of rights or claims of offsets.

71. The above-referenced facts and circumstances are such that it would be inequitable for PAPA to retain the benefits that BPA conferred upon it without paying their fair value.

72. As a result of the foregoing, BPA has suffered damages in the amount of $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue, which is the reasonable value of the services it rendered.

73. PAPA is liable to BPA for payment of all amounts sought hereunder under its claims of quasi contract and/or quantum meruit.

## COUNT IV.
### (Alternative Claim for Unjust Enrichment)

74. BPA repeats and realleges the allegations set forth in numbered paragraphs 1-40 as if set forth at length herein..

75. Assuming, *arguendo,* solely for purposes of this claim, pled in the alternative, that the parties did not have a contract, as alleged above, BPA seeks recovery for the value of its services under the alternative theory of unjust enrichment.

76. PAPA has been enriched by BPA's satisfactory performance of its services at issue herein, in that it received the benefit of such services that it had requested from BPA.

77. PAPA's enrichment, as set forth in the preceding paragraph was at BPA's expense in that BPA has, to this point, satisfactorily performed all services without compensation, and has had to use its own funds to pay the labor, material and other costs of performing the services.

78  PAPA voluntarily accepted and retained the benefits of the services it received from BPA, and it was thereby enriched by receiving the benefit of BPA's services.

79. PAPA's enrichment occurred at BPA's expense, and the circumstances are such that it would be inequitable for PAPA to retain the benefits without paying the value thereof to BPA.

80. Given this, and all of the other facts pled herein, in equity and good conscience, PAPA should compensate BPA in the amount by which it has been enriched, *i.e.,* the unpaid amount of BPA's invoices amounting to $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue, which is the reasonable value of the services rendered.

81. PAPA is liable to BPA for the amount by which it has been enriched under BPA's claim of unjust enrichment.

## COUNT V.
### (Alternative Claim for Promissory Estoppel)

82. BPA repeats and realleges the allegations set forth in numbered paragraphs 1-40 as if set forth at length herein.

83. Assuming, *arguendo,* solely for purposes of this claim, pled in the alternative, that the parties did not have a contract or series of contracts, as alleged above, BPA seeks recovery for the value of its services under the alternative theory of promissory estoppel.

84. PAPA promised to pay BPA for its services.

85. BPA relied upon such promises and undertook the necessary labor and expense to perform the requested services.

87. PAPA's promises discussed above induced BPA to perform its services for PAPA.

88. BPA's reliance upon PAPA's promises was reasonable and foreseeable for a number of independent reasons, including the facts that: (i) PAPA knew that BPA was a for-profit business that did not perform services for free; (ii) the parties had exchanged oral and written communications and agreements that, if not amounting to legally binding contracts, reflected promises by BPA to provide its services and PAPA to pay for such services; and (iii) by the time of BPA's later performance of services, the parties had a prior course of dealings pursuant to which BPA performed its services and received compensation in return at the prices charged by it.

89. As BPA: (i) performed its services that PAPA requested and that benefited PAPA; (ii) made expenditures for labor, materials and other costs in connection therewith; and (iii) has not received payment for such services, it was injured by its reliance upon PAPA's promise in the amount of the unpaid invoices, *i.e.,* $115,722.59 as of August 16, 2024,

including accrued interest, and with interest continuing to accrue, which is the reasonable value of the services rendered.

90. The foregoing facts demonstrate that injustice can only be avoided by enforcing PAPA's promises to pay BPA for its services.

91. PAPA is liable to BPA for the value of BPA's services in such amount under BPA's claim of promissory estoppel.

## **PRAYER FOR RELIEF**

**WHEREFORE,** BPA respectfully requests the Court to grant it the following relief:

a. With respect to Count I., award to BPA the sum of $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue at the rate of three percent per month or the highest rate allowed by law, whichever is higher, resulting from PAPA's breach of contract and/or breach of the implied warranty of good faith and fair dealing, together with BPA's costs, expenses and disbursements, including reasonable attorneys' fees and costs;

b. With respect to Count II., award to BPA the sum of $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue at the rate of three percent per month or the highest rate allowed by law, whichever is higher, regarding BPA's account stated claim, together with BPA's costs, expenses and disbursements, including reasonable attorneys' fees and costs;

c. With respect to Count III., award to BPA the sum of $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue at the rate of three percent per month or the highest rate allowed by law, whichever is higher, regarding BPA's

quasi-contract/quantum meruit claim, together with BPA's costs, expenses and disbursements, including reasonable attorneys' fees and costs;

d. With respect to Count IV., award to BPA the sum of $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue at the rate of three percent per month or the highest rate allowed by law, whichever is higher, regarding BPA's unjust enrichment claim, together with BPA's costs, expenses and disbursements, including reasonable attorneys' fees and costs;

e. With respect to Count V., award to BPA the sum of $115,722.59 as of August 16, 2024, including accrued interest, and with interest continuing to accrue at the rate of three percent per month or the highest rate allowed by law, whichever is higher, regarding BPA's promissory estoppel claim, together with BPA's costs, expenses and disbursements, including reasonable attorneys' fees and costs; and

f. Grant such other and further relief as is just.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all issues and claims triable by a jury.

Dated: May 13, 2025

Respectfully submitted,

BY: */s/ Joseph A. Osborne, Esq.*
Joseph A. Osborne, Esq.
Florida Bar No. 880043
J. Robert Bell III, Esq.
Florida Bar No. 115918
**OSBORNE & FRANCIS, PLLC**
925 S. Federal Hwy, Suite 175
Boca Raton, FL 33432
Ph: (561) 293-2600
Fax: (561) 923-8100

josborne@realtoughlawyers.com
rbell@realtoughlawyers.com
dmonahan@realtoughlawyers.com

    -AND-

LAW OFFICES OF PATRICK J. SULLIVAN
Patrick J. Sullivan, Esq. (*pro hac vice forthcoming*)
92 Willis Avenue, Second Floor
Mineola, New York  11501
Phone: (516) 342-1248
Fax:    (516) 747-9405
Lawofficespjs1@optonline.net

*Attorneys for the Plaintiff BPA International, Inc.*